UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SCARFF BROTHERS, INC.,

               Plaintiff/Counter-defendant,          Case Number 04-10071-BC

v.                                                Honorable Thomas L. Ludington

BISCHER FARMS, INC.,

               Defendant/Counterclaimant,

MELVIN J. BISCHER; JANET S. BISCHER;
PAULINE GEIGER, a/k/a Pauline Bischer, Pauline
Bischer-Geiger; BRADLEY GEIGER; DUANE
GEIGER; MELVIN J. BISCHER, L.L.C.;
JANET S. BISCHER FARMS, INC.; BISCHER
TILING, INC.; BISCHER READY-MIX, INC.;
PAULINE J. BISCHER-GEIGER, L.L.C.;
JANET S. BISCHER, L.L.C.; BISCHER FARMS,
PARTNERSHIP,

               Defendants.
_____/

## **OPINION**

The parties' quest to account for cattle inventory, the core dispute in this case, culminated in almost four years of litigation and a lengthy bench trial. On September 6, 2007, after the bench trial had already spanned 17 half-days, the Court issued an order noting the availability of Federal Rule of Civil Procedure 52(c), which allows a court to reach judgment on partial findings. In addition to dedicating the Court's calendar to this bench trial from December 12, 2006 through December 16, 2006, from April 24, 2007 through April 27, 2007, from April 30, 2007 through May 4, 2007, from August 20, 2007 through August 21, 2007, and from August 23, 2007 through August 24, 2007, the Court further attended to additional half-days of trial from January 8, 2008 through January 11, 2008 and from January 14, 2008 through January 16, 2008. Only after 24 half-days of

trial did the parties complete their proofs.

In the first 17 days of trial, the Court heard from counsel, as well as testimony from six witnesses: Lance Scarff, Howard Scarff, Frank Bredimus, Melvin Bischer, Duane Geiger, and Janet Bischer.  As discussed in greater detail below, Lance and Howard Scarff, two brothers who reside in Maryland, own Scarff Brothers, Inc. (Scarff Brothers), the plaintiff and a cattle brokerage company.  Frank Bredimus is a friend of the brothers and also an attorney.  Scarff Brothers placed some of its cattle from August 2002 through February 2004 at Bischer Farms, a cattle feedlot, which is owned members of the Bischer family, including Melvin and Janet Bischer, who are defendants. Duane Geiger, one of the defendants and the brother of Melvin Bischer's son-in-law, oversaw the care of Scarff Brothers' cattle housed at Bischer Farms until Melvin Bischer terminated his employment in January 2004.  Janet Bischer partly owns Bischer Farms and fulfills a wide variety of administrative and bookkeeping responsibilities for all of the family businesses.  During the most recent seven days of trial, the Court received the benefit of testimony from six additional witnesses: Ambrose Messing, a fieldhand at Bischer Farms; Michelle Powell, a secretary at Bischer Farms; Richard Kaylor, a detective for the Huron County Sheriff's Department; Richard Chambers, an insurance agent; Dr. Arnold Hentschl, a veterinarian; and Bradley Geiger, a defendant who worked as a farmer, trucker, and in other roles at Bischer Farms.

Despite the length of the trial, however, the case is amenable to succinct synopsis.  Scarff Brothers hired Bischer Farms to feed and care for 10,034 head of its cattle until the cattle went to market.  In February 2004, Melvin Bischer informed the Scarffs that a substantial number of their cattle were missing.  Shortly thereafter, Scarff Brothers removed its cattle from Bischer Farms. Scarff Brothers later sued the defendants on a variety of legal theories for the loss of the cattle, and

Bischer Farms, Inc. counterclaimed for breach of contract.

Several features of these proceedings combine to reveal an approach to financial dealings and business operations and to federal legal practice that the Court must characterize as, at best ,unusual. The volume of transactions and the years of business dealings between Scarff Brothers and Bischer Farms resulted in literally thousands of associated business records. Scarff Brothers maintained bookkeeping records and supporting source documents; Bischer Farms, however, maintained or retained very few records. This near total absence of business records required Bischer Farms to reconstruct its theory of events from Scarff Brothers' records, third party records, and then the excavation of dead cattle from a composter. That is, Bischer Farms sought to unearth ear tags from dead cattle to demonstrate not only what their limited records did not (the fact of the death of the cattle) but to contradict their own progress billings for the care and feeding of cattle that they now contend are dead. Thus, Bischer Farms sought to show that the Scarff Brothers' cattle were not stolen but that they succumbed to a routine rate of mortality.

During the litigation, Bischer Farms' non-responsive and selective discovery required the parties to develop their case as new data materialized. For example, despite the initiation of this litigation in 2004, an employee of Bischer Farms revealed on the stand in 2008 that he developed and kept a weekly physical count of cattle broken down by ownership between feedlot clients and the Bischers. Bischer Farms did not produce these documents during discovery. Similarly, a secretary at Bischer Farms testified and later produced an inventory of Scarff Brothers' cattle in which, starting in early 2003, she recorded charges for cattle shipped to and from Bischer Farms. Bischer Farms did not produce these documents during discovery. Indeed, the Bischers' insurance agent, Chambers, testified that he received routine certifications of cattle inventory broken down by

cattle owner to establish premiums for the cattle inventory. The documents were not produced in discovery or at trial. Additionally, the parties made limited use of accounting experts, so lay persons presented the relevant accounting information, at times developing their views as the case proceeded.

For these reasons, coupled with the lack of pretrial motion practice,[1] the volume, intricacy, and difficulty of receiving proofs threatened to engulf the proceedings. Due to the structure and organization of the respective proofs as presented by the parties, the findings of fact that follow appear in a narrative form, rather than itemized as individual findings. As Federal Rule of Civil Procedure 52(a)(1) provides, "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *See also* 9 Moore's Federal Practice 3d § 52.13[1][b] (2006) ("No particular format is required for the court's findings of fact and conclusions of law.").

## I. Facts

### A. The Parties

To reiterate and expand upon the introduction to the parties provided above, Lance and Howard Scarff, two brothers, own Scarff Brothers. Howard Scarff acts as the company's field agent, negotiating for the purchase and sale of cattle. He also negotiates the terms under which Scarff Brothers places cattle with feedlots throughout the country, where the cattle are fed and cared for

---

[1]The docket reflects that the plaintiff filed one motion for partial summary judgment and two motions *in limine*, all of which were denied. The predecessor judge also struck the defendants' two motions for summary judgment, the defendants' motion challenging the plaintiff's expert witness, and many other of the defendants' filings for a variety of deficiencies, such as for failing to conform to E.D. Mich. LR 5.1. Additionally, the predecessor judge, on April 12, 2005, noted the defendants' repeated failure "to conform to standards required of practice in federal district court."

until they are slaughtered for sale. Lance Scarff acts as the company's accountant, maintaining their books largely from their base of operations in Maryland.

Melvin and Janet Bischer, two of the defendants, owned and operated another of the defendants, Bischer Farms, Inc., a feedlot at which they maintained their own cattle and where, at times, they custom fed cattle owned by others. Bischer Farms, Inc. later became (as will be discussed in greater detail below) Bischer Farms Partnership, which is also a defendant.

Diversified entrepreneurs, Melvin and Janet Bischer own or actively participate in a variety of businesses that are, nevertheless, operated as a single enterprise. In addition to the feedlot, these enterprises encompass a concrete business (Bischer Ready-Mix, Inc.), a field tile business (Bischer Tiling, Inc.), and a trucking company (Janet S. Bischer Farms, Inc.). Bischer Ready-Mix, Inc.,[2] Bischer Tiling, Inc.,[3] and Janet S. Bischer Farms, Inc. are also named as defendants.

Bischer Farms Partnership leases approximately 9,800 acres of land to operate a cash crop farm and cattle feedlot. According to financial statements, Melvin and Janet Bischer own 2,396 acres, which they lease to Bischer Farms, Inc. Their son-in-law and daughter, co-defendants Bradley and Pauline Geiger, lease 1,474 acres to Bischer Farms, Inc., and an additional 5,930 acres are leased from third parties. *See* Pl. Ex. 103. According to the Bischers' accountant, Faupel, Bischer Farms Partnership was created to qualify for additional government subsidies unavailable to a corporation.

The shareholders, directors, and officers of the corporations, the members of the limited

---

[2]Janet Bischer is the secretary for Bischer Ready-Mix, Inc.

[3]Janet Bischer is the secretary for Bischer Tiling, Inc., but she receives no compensation for that role.

liability companies, and the partners in the partnership are either members of the Bischers' family or comprised of members of the Bischers' family. Melvin and Janet Bischer and Bradley and Pauline Geiger own Bischer Farms, Inc. in equal shares. For that corporation, Bradley Geiger is the president, Melvin Bischer is the vice president, Pauline Geiger is the treasurer, and Janet Bischer is the secretary. The partners in Bischer Farms Partnership are Melvin J. Bischer, L.L.C.; Janet S. Bischer, L.L.C.; Pauline J. Bischer-Geiger, L.L.C., and Bradley Geiger, L.L.C. The sole member of each limited liability company is the individual whose name the limited liability company bears. Melvin J. Bischer, L.L.C.; Janet S. Bischer, L.L.C.; and Pauline J. Bischer-Geiger, L.L.C. are named as defendants. Similarly, Bischer Tiling, Inc., Bischer Ready-Mix, Inc., and Janet S. Bischer Farms, Inc. have directors and officers in common with the other business entities.

Finally, although he holds no ownership interest in any of the business entities, Bradley Geiger's brother, Duane Geiger, is also a defendant. Duane Geiger managed the feedlot at Bischer Farms during much of the relevant period as an employee.

B. Missing Cattle

At some point during Scarff Brothers' business relationship with Bischer Farms, many head of Scarff Brothers' cattle were identified as missing. Notwithstanding many direct contradictions with his deposition testimony, his responses during discovery, and his trial testimony, the testimony of Melvin Bischer demonstrated that an accountant assisted in counting cattle approximately every four months at Bischer Farms. In September or October 2003, the accountant's count reflected cattle missing from Bischer Farms. After performing three additional cattle counts between September and November 2003, the personnel at Bischer Farms further verified that cattle were missing. As of November or December 2003, Melvin Bischer testified that he believed that "400 plus" head of

cattle were missing.  According to Melvin Bischer, Duane Geiger also knew of that discrepancy, although his testimony was not clear.

On January 30, 2004, as attested by Lance Scarff, Melvin Bischer told him in a telephone call that Duane Geiger had been fired.  Duane Geiger had served as the feedlot manager for Scarff Brothers' cattle at Bischer Farms as the main, if not only, person with whom Howard Scarff had contact about the status of Scarff Brothers' cattle there.  Melvin Bischer indicated that Duane Geiger was fired for lying and for misuse of a company phone, but he did not refer to any difficulty with Scarff Brothers' cattle.  Melvin Bischer stated that Duane Geiger's brother, Bradley Geiger, would fill the role of feedlot manager.  Howard Scarff later spoke to Bradley Geiger about the situation on February 4 or 5, 2004, and Bradley Geiger related that at least 100 head of Scarff Brothers' cattle were missing.

On February 11, 2004, according to Melvin Bischer's testimony, the Scarffs arrived at Bischer Farms.  As they arrived, Melvin Bischer ran out to them, shouting that "It's worse than we thought."  Melvin Bischer told the Scarffs that Duane Geiger had stolen over 400 head of their cattle. The following day, on February 12, 2004, Melvin Bischer, accompanied by Lance and Howard Scarff, reported the theft of 400 head of cattle to the Huron County Sheriff's Department.  Melvin Bischer did not inform either the Scarffs or the authorities that he believed the cattle had died.  On February 18, 2004, in the presence of Howard Scarff, Frank Bredimus, counsel for the defendants, H. Dale Cubitt, and Dr. Hentschl, Melvin Bischer stated that he and his wife believed, as early as October 2003, that Duane Geiger was stealing cattle.

C. Agreement between Scarff Brothers and Bischer Farms

According to the testimony of Howard Scarff, Scarff Brothers began conducting business

with Bischer Farms in August 2002. Howard Scarff and Duane Geiger verbally agreed that Scarff Brothers' cattle would be fed and cared for at Bischer Farms until the cattle went to market. Howard Scarff stated that they agreed to a term of a maximum cost of gain per pound[4] of $0.50 for colored cattle and $0.55 for Holsteins, an insurance cost of $0.07 per head of cattle per month, and the cost of any veterinary care in excess of 6%. Scarff Brothers continued to send cattle to Bischer Farms under this oral understanding until the spring of 2003, at which time the parties sought to memorialize their agreement in writing.

Duane Geiger, during his testimony, authenticated a document as the signed original of that contract, which is dated as March 8, 2003. Howard Scarff provided contrary testimony. He stated that Duane Geiger presented him with a writing that already contained the signature of Bradley Geiger, as president of Bischer Farms, Inc. Duane Geiger testified that he and Howard Scarff proceeded to revise the terms of the contract, largely in conformity to the oral understanding that had guided their transactions up to that date. Howard Scarff testified that he initialed every page on which they made changes, which they handwrote onto the draft. According to Howard Scarff, the handwritten changes included in the contract authenticated by Duane Geiger were not the changes that they made. When confronted with the document he had authenticated, Duane Geiger could not identify the handwriting on the document as his own. Howard Scarff testified that Duane Geiger agreed to provide a final version of the contract with the handwritten changes incorporated in a typewritten version. Each of them retained a copy, but Howard Scarff testified that he lost his copy.

---

[4]The "maximum cost of gain per pound" is a cap placed on the price that it costs for a steer or heifer to gain one pound of weight. This measure accounts for items, such as feed, necessary to develop and "finish" cattle to a size and quality where it is profitable to slaughter them, based on market conditions.

Scarff Brothers never received a finalized version of the contract described by Howard Scarff, and Duane Geiger agreed that no final version of the contract, without handwritten changes, was ever created.

Despite Bischers Farms' reliance on the price provisions of this writing, they tendered to the Court evidence that clearly established the parties' course of conduct. Bischer Farms' own documents and correspondence support the existence of their practice of negotiating Bischer Farms' compensation by lot. For instance, on March 1, 2003, Duane Geiger sent Scarff Brothers a statement that noted that the "[p]rice per pound [of] gain includes in-processing and [*sic*] schute fees." Pl. Ex. 104. In correspondence to Scarff Brothers, dated June 9, 2003, Duane Geiger advised that all cattle received after a certain date would be subject to "revised price caps." Pl. Ex. 105. He stated, "All of the cattle fed for [Scarff Brothers] have come under dollars per [pound of] gain to this point and I expect that to continue." *Id*. On September 17, 2003, Duane Geiger sent Scarff Brothers another statement which listed the costs of gain per pound for certain weights, which would be "[g]ood for incoming cattle present [through December] 1, 2003." Pl. Ex. 106. Duane Geiger concluded, "Prices will not exceed they may only lower." *Id*. In a statement from December 8, 2003, Duane Geiger included the following note, "Here are the maximum [dollar] amounts per pound of gain on incoming cattle for [December], [January], [February]." Pl. Ex. 107.

### D. Scarff Brothers' Business Records and the Removal of Its Cattle from Bischer Farms

During the course of Scarff Brothers' business dealings with Bischer Farms, Lance Scarff maintained complete records that summarized each transaction. Scarff Brothers organized its cattle at Bischer Farms in sequentially numbered "lots." Lots served as a tracking mechanism, selected by Scarff Brothers, to designate cattle purchased at approximately the same time or from the same

source, or otherwise delivered together. Among other things, this mechanism permitted Scarff Brothers to track the profitability of cattle (the cost of the cattle, transportation expenses, and payment for care at Bischer Farms, deducted from slaughterhouse revenue).

For each lot of cattle delivered to Bischer Farms, Lance Scarff routinely created and maintained a "lot sheet" that summarized all the information pertinent to each particular lot. The lot sheet included the negotiated maximum cost of gain per pound for that lot of cattle, the party who sold the cattle to Scarff Brothers, the incoming weight of the cattle, the cost of the cattle, the party who trucked the cattle, the cost of trucking, all costs associated with the feeding and housing of the cattle as billed by Bischer Farms (including reported deaths), all cattle that died, the party to whom Scarff Brothers sold the cattle or the slaughterhouse, the outgoing weight of the cattle, an analysis of the cost of gain per pound for that particular lot, and Scarff Brothers' profit/loss for that particular lot.

Scarff Brothers provided the original source documentation to support the figures in the lot sheets. Lance Scarff retained the purchase invoice for each lot of cattle, a weight slip for cattle at the time of purchase, and the invoice for trucking the cattle to Bischer Farms. He also kept copies of payments that Scarff Brothers made to Bischer Farms in response to progress invoices intended to reimburse Bischer Farms approximately 50-70% of their cost of caring for the cattle. Lance Scarff testified that he kept these documents in the same manner and in the ordinary course of business for all the lots of cattle shipped to Bischer Farms, and Scarff Brothers' carefully assembled exhibits supports this conclusion.

Once the cattle were received by Bischer Farms, Duane Geiger, or another employee at Bischer Farms, verified that Bischer Farms received the cattle as anticipated by Scarff Brothers.

Duane Geiger testified that he kept some written personal records and some records on a laptop computer that was later destroyed. Through frequent phone conversations, Howard Scarff confirmed with Duane Geiger that the cattle had arrived and verified the numbers of head.

Based on Duane Geiger's input, Bischer Farms billed Scarff Brothers monthly for expenses, reducing the charge for any dead cattle, costs for veterinary care (according to the allocation set by the parties), or other associated expenses. Those charges were also reduced by any amount previously paid on that lot by Scarff Brothers, and nearly all of the charges were itemized by lot number. After reviewing the charges for mathematical accuracy and consistency with his own lot sheets, Lance Scarff would issue payment on those monthly invoices.

Once the cattle were finished (i.e., developed to a point that continued feeding would not be cost-effective), or at least marketable (i.e., saleable to avoid a loss), Howard Scarff and Duane Geiger would be in communication about which cattle to send to market. With Howard Scarff's input and guidance generally and on the number of head of cattle specifically, Duane Geiger would select the cattle for sale. He would then arrange for cattle to be trucked to the stockyard. The "kill sheets," on which the stockyard personnel recorded the outgoing weight of the cattle, would then be received by Lance Scarff. He, in turn, would share that information with Duane Geiger by telephone or facsimile in order for Duane Geiger to issue a final bill.

When the last head of cattle from a particular lot was marketed, Bischer Farms issued Scarff Brothers a final bill, or "closeout" invoice, for each lot. The closeout invoice accounted for all of the cattle in that lot, including the number of head delivered, head sold, and head that died. The closeout invoice also stated all remaining charges for the feed and care of that particular lot. Upon receipt of that closeout invoice, Lance Scarff analyzed the invoice to ensure that the cumulative

charges for a particular lot did not exceed the agreed upon maximum cost of gain per pound, regardless of how Bischer Farms categorized its expenses, such as for yardage, processing, and feed. He would review the figures against his own lot sheet and then issue payment accordingly. Generally, the information in each lot sheet corresponds to the closeout invoices issued by Bischer Farms.

Scarff Brothers delivered a total of 60 lots to Bischer Farms. Of those 60 lots, 40 lots were closed out, based on information prepared by Duane Geiger. This information included any report of dead cattle for each lot. The dates of the closeout invoices, by lot, are as follows:

| Lot Number | Date of Closeout Invoice |
|---|---|
| 1 | February 21, 2003 |
| 2 | February 14, 2003 |
| 3 | March 3, 2003 |
| 4 | April 10, 2003 |
| 5 | April 10, 2003 |
| 6 | March 13, 2003 |
| 7 | May 24, 2003 |
| 8 | April 10, 2003 |
| 9 | May 24, 2003 |
| 10 | May 24, 2003 |
| 11 | June 25, 2003 |
| 12 | September 2, 2003 |
| 13 | September 29, 2003 |
| 14 | October 23, 2003 |
| 15 | June 13, 2003 |
| 16 | October 17, 2003 |
| 17 | October 23, 2003 |
| 18 | August 6, 2003 |
| 19 | November 24, 2003 |
| 20 | November 6, 2003 |
| 21 | August 1, 2003 |
| 22 | September 8, 2003 |
| 23 | September 8, 2003 |
| 24 | December 4, 2003 |
| 25 | October 30, 2003 |
| 26 | September 18, 2003 |
| 27 | October 17, 2003 |
| 28 | September 18, 2003 |
| 29 | November 24, 2003 |
| 30 | December 4, 2003 |
| 31 | December 10, 2003 |
| 32 | December 10, 2003 |
| 33 | November 24, 2003 |
| 34 | October 30, 2003 |
| 35 | October 30, 2003 |
| 36 | October 23, 2003 |
| 37 | December 4, 2003 |
| 38 | November 24, 2003 |
| 39 | January 21, 2004 |
| 40 | November 24, 2003 |

Bischer Farms' Closeout Invoices to Scarff Brothers by Lot and Date

After the closeout of the first 40 lots, Scarff Brothers had shipped 7,194 head of cattle to Bischer Farms, 22 head of cattle had died, and 7,172 head of cattle were sold. Bischer Farms never informed Scarff Brothers of any cattle deaths in those lots, apart from those 22 head. (Those lots also included 57 head of cattle that were considered "railers," i.e., cattle that survived but did not gain sufficient weight to be profitable.)[5] Scarff Brothers required the information about cattle death loss so that it could seek financial credits from the seller of cattle that had died, if warranted.

Scarff Brothers shipped an additional 2,840 head of cattle to Bischer Farms in lots 41 through 60. Scarff Brothers made its final cattle shipment to Bischer Farms on January 27, 2004.

Unlike lots 1 through 40, cattle in the later lots were not closed out, because Scarff Brothers removed them from Bischer Farms to protect them. Instead, those cattle were counted in a physical inventory on February 11, 2004, performed by Bischer Farms personnel and by Lance and Howard Scarff. They ran the cattle down an alley. Lance Scarff checked for the presence of a Scarff Brothers eartag of either "HS" or "S," and Howard Scarff and Bischer Farms' employees separately counted the cattle and ensured that their figures corresponded. At the end of this count, 491 head of Scarff Brothers' cattle were missing, based on Scarff Brothers' records. The Scarffs then loaded as many cattle as possible onto two trucks, ensuring that each animal had a Scarff Brothers eartag, and sorted out a third load for shipment when a truck became available.

On March 2, 2004, Lance Scarff returned to Bischer Farms. With the assistance of Bischer Farms personnel, they again counted the remaining Scarff Brothers' cattle and again found that 491 head of cattle were absent.

---

[5]During the same period that Scarff Brothers housed cattle with Bischer Farms, Scarff Brothers also housed more than 2,600 head of similar cattle at another Michigan farm. At that farm, Scarff Brothers suffered no death loss.

On March 15 and 16, 2004, Scarff Brothers removed its remaining cattle from Bischer Farms. Accounting for the cattle that had previously been removed, the number of head of cattle removed on those dates was, again, consistent with the conclusion that 491 head of cattle were missing.

### E. The Defendants' Alternate Theory

The defendants, however, presented an alternate theory to account for the missing cattle. According to Melvin Bischer, he initially reported the cattle as stolen, but his beliefs about the reason for their absence changed over time. Although Melvin Bischer first identified Duane Geiger as responsible for the loss, Detective Kayler testified that Melvin Bischer and Duane Geiger later appeared to "join hands" against the Scarffs. The defendants then sought to explain the missing cattle by asserting that they died. Indeed, Melvin Bischer testified rather dramatically at trial that everyone knew of the unusual death loss because of the overwhelming odor of decomposing animals. With the exception of 72 head of cattle that the defendants contended never arrived, they attributed the absence of certain head of cattle to their death, including 189 head of cattle from lots 1 through 40 on which Bischer Farms had billed Scarff Brothers for feed and care. The defendants proceeded to explain, incredibly in the Court's view, that they were able to account for all of Scarff Brothers' cattle in lots 1 through 40 by substituting cattle from lots 41 through 60. According to this extraordinary explanation, that substitution occurred with Scarff Brothers' knowledge and consent.

Due to the lack of independent record-keeping at Bischer Farms, the defendants sought to reconstruct their death loss theory by performing a most unusual physical review of dead cattle. Bischer Farms collected dead cattle in a composter. The physical inventory, then, involved removing decomposing cattle from the composter and collecting eartags to identify each animal by

-15-

its owner.  The defendants offered the Court a variety of sources to support their assessment of how many head of Scarff Brothers' cattle died, including the collection of eartags (some of which may have still been attached to decomposing cattle parts), a video recording of the physical count that occurred over many days, a written summary of the "dead loss," an amended written summary of the dead loss, and a second amended written summary of the dead loss.  Another of the defendants' proliferating summary documents[6] is the defendants' "Amended Inconvenient Truth."  According to this document, the defendants maintain that 189 additional head of cattle died in lots 1 through 40 and that 134 additional head of cattle died in lots 41 through 60.  With the inclusion of 22 head of cattle confirmed by Scarff Brothers as dead, the defendants invite the Court to conclude that 189 + 134 + 22 = 345, i.e., the number of head of cattle that the defendants would identify as dead.  Below is the defendants' document entitled "Amended Inconvenient Truth," which the Court includes for its demonstrative value:

---

[6]After the close of proofs, the Court directed the parties to provide their closing arguments in writing.  Attached to the defendants' memorandum setting forth their closing argument are three new "exhibits."  One "exhibit," on its face, was created after the close of proofs.  Rather than strike the three "exhibits" that were not identified as prospective exhibits and were not offered into evidence, the Court will retain them on the docket as demonstrative exhibits.

# AMENDED INCONVENIENT TRUTH "LOTS" 1-40

A. Additional Deads:         189

B. Cattle Not Received:      72

C. Cattle Sold Not Reported:  <u>42</u>

   Total:            303

D. 303 Cattle Reported Sold In "Lots" 1-40 Came From "Lots" 41-60

## "LOTS" 41-60

A. Additional Deads:         134

B. Cattle Not Reported:      <u>5</u>

   Total:            139

Summary Of Cattle
   Accounted For:      303+
                        <u>139</u>=
                        442



DEFENDANT'S EXHIBIT

In further support of their theory, the defendants offered the testimony of Duane Geiger, the feedlot manager for Bischer Farms before the termination of his employment. According to Duane Geiger, the Scarffs knew how many head of cattle had died, despite Bischer Farms' failure to record the dead cattle along with other cattle deaths. Rather, Duane Geiger maintained, Scarff Brothers agreed to "fill out" the unreported dead cattle in lots 1 through 40 by substituting cattle from lots 41 through 60. He could not explain, however, why Scarff Brothers would pay for the feed for 189 head of dead cattle. Nor could he explain why he continued to negotiate a maximum cost of gain per pound by lot, given that he could not know what cattle would be assigned to what lot. He further testified that, when Howard Scarff directed him to send a load of cattle to market, he would select the best cattle for the load and then inform Howard Scarff of the number of head of cattle and their lot number. The inconsistencies in his testimony were frequent and marked. Whether he was testifying to protect himself or someone else, it was visually apparent to the Court that he was not telling the truth. His testimony was not credible.

## F. Conclusion to Facts

The Court is not persuaded by the incredible theory of the case postulated by the defendants. The irregularity and unreliability of their recordkeeping, the lack of credibility of multiple witnesses, and the unlikelihood that the Scarffs would agree to conduct so contrary to their business interests causes the Court to conclude that the defendants' proofs do not substantiate the theory they advanced. Instead, the Court is persuaded by the careful and consistent business records of Scarff Brothers, the credibility of its witnesses, and the coherence between their conduct and business objectives. The Court finds that 491 head of Scarff Brothers' cattle arrived at Bischer Farms and have subsequently gone unaccounted for. The closeout invoices for lots 1 through 40, based on the

defendants' own admission via their business practice, demonstrate that Bischer Farms misrepresented the status of no less than 189 head of cattle. Whether Bischer Farms maintained the 491 head of cattle or otherwise benefitted from them, however, was not demonstrated by Scarff Brothers' proofs. Accordingly, the Court adopts as its findings of fact sections I.A through I.D, excepting Duane Geiger's testimony regarding a purportedly original contract, but rejects the postulations of the defendants as described in section I.E.

## III. Legal Analysis

## A. Claims and Counterclaim

Scarff Brothers raised a variety of legal theories against Bischer Farms, Inc. regarding Scarff Brothers' missing cattle, including claims of (1) breach of contract (count XX); (2) negligence (count I); (3) innocent misrepresentation (count II); (4) fraudulent misrepresentation (count III); (5) negligent misrepresentation (count IV); (6) silent fraud (count V); (7) breach of fiduciary duty (count VI); and (8) breach of bailment (count XXI). Additionally, Scarff Brothers asserts claims of common law conversion against Bischer Farms, Inc., Melvin Bischer, and Duane Geiger (counts VIII through X) and of statutory conversion under Mich. Comp. Laws § 600.2919a against Bischer Farms, Inc., the individual defendants,[7] Melvin J. Bischer L.L.C., Janet S. Bischer, L.L.C., and Janet S. Bischer Farms (counts XI through XIX). Scarff Brothers also asserts claims of civil conspiracy against Bischer Farms, Inc. and the individual defendants (count VII) and alter ego liability against Bischer Farms Partnership, Melvin Bischer, Janet Bischer, Pauline Geiger, Bradley Geiger, Bischer Tiling, Inc., Bischer Ready-Mix, Inc., Janet S. Bischer Farms, Inc., Melvin J. Bischer L.L.C., Janet

---

[7]The individual defendants are Melvin Bischer, Janet Bischer, Pauline Geiger, Bradley Geiger, and Duane Geiger.

S. Bischer L.L.C., and Pauline J. Bischer-Geiger L.L.C. (count XXVIII). Finally, Scarff Brothers seeks exemplary damages against Bischer Farms, Inc. and the individual defendants (counts XXII through XXVII).

Additionally, Bischer Farms, Inc. filed a counterclaim for breach of contract. Despite the inclusion of many defendants, with potentially competing interests, all of the defendants elected to provide a united and single defense. The same attorney, intimately involved in the events from at least early 2004, represented all of them. Consequently, for ease of reference and where the designation will not obscure a material distinction, the Court will refer to the defendants collectively as "the Bischers."

All the parties' claims are state law claims, and Scarff Brothers filed the case here on the basis of diversity jurisdiction under 28 U.S.C. § 1332. Regarding state law claims, a federal district court must apply the substantive law of the state in which it sits. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938).

B. Scarff Brothers' Claim of Breach of Contract

In Michigan, a claim for breach of contract requires a showing of parties competent to contract, proper subject matter for a contract, legal consideration, mutuality of agreement, mutuality of obligation, and breach. *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005). A contract may be established through a writing describing the parties' mutual assent, but a contract may also be implied in fact. *Compare Reed v. Yackell* 703 N.W.2d 1, 7 (Mich. 2005) (citation omitted). "A contract implied in fact arises under circumstances which, according to the ordinary course of dealing and common understanding . . . show a mutual intention to contract." *Erickson v. Goodell Oil Co., Inc.*, 180 N.W.2d 798, 800 (Mich. 1970) (citations omitted). The finder of fact

reviews all the facts and circumstances to evaluate the parties' intent and can infer the contract's existence and terms from the conduct of the parties, by looking to their visible acts. *See Rowe v. Montgomery Ward & Co., Inc.*, 473 N.W.2d 268, 273 (Mich. 1991) (citation omitted).

Here, the parties do not dispute the existence of an agreement that Scarff Brothers would send cattle to Bischer Farms to be fed and cared for until the cattle were ready to go to market. Yet Scarff Brothers and the Bischers do differ as to what defines the material terms of that contract. Scarff Brothers maintain that the parties' course of dealing from August 2002 to January 2004 establishes the terms of their contract. The Bischers offer a written document, signed by Bradley Geiger and Howard Scarff and dated March 8, 2003, as that contract. Thus, the parties dispute whether the writing proffered by the Bischers or the course of dealings between them establishes the existence of a contract.

The writing offered by the Bischers lists the parties to the contract as Scarff Brothers and Bischer Farms, Inc. Howard Scarff, while not denying that he did sign a version of a similar document, vehemently disagrees that the document offered into evidence is the document that he signed. Both Howard Scarff and Duane Geiger attested that they attempted to memorialize their existing dealings in written form. That fact comports with the absence of any writing from August 2002 through March 8, 2003, during which time many lots of cattle were closed out. The dispute over particular terms in that writing and whether the handwritten modifications are complete or accurate has less bearing than a business cycle that repeated over years. The consistent receipt, handling, and processing of cattle and corresponding documentation establishes this pattern of business dealings. The writing serves to reinforce the conclusion that some mutual agreement did

exist,[8] but the course of performance demonstrates a consistent understanding of their agreement in fact. (The parties do acknowledge that certain terms of the writing did capture the course of their performance.)

Indeed, any purported discrepancy between the Bischers' current version of the document and Howard Scarff's recollection of it did not impede the parties' continued business dealings from

---

[8]For instance, both Scarff Brothers and Bischer Farms agreed that the provision regarding costs associated with dead cattle appears unchanged in the writing offered by the defendants. That provision stated:

> 14. DEATH LOSS: OWNER bears all risk of loss or damage to the cattle except for loss or damage caused by FEEDER's breach of this agreement, or negligence or other fault of FEEDER. OWNER accepts all economic loss resulting from death of the CATTLE.
>
> a. Provided however, in the event that the death loss of the CATTLE exceeds three percent (3%) of the total of OWNER's CATTLE as herein described, FEEDER agrees to compensate OWNER to the actual verified purchase value of the CATTLE at payweight that exceed the 3% death loss. Provided however the cap on the death loss for which FEEDER shall be responsible is an additional two percent (2%). In the event that such action is required, the reimbursement shall occur at the time of the last billing when all CATTLE in the group have been sold. However if the financial loss for dead CATTLE is covered by a third party, such as, but not limited to an insurance carrier, FEEDER is not required to reimburse OWNER.
>
> b. FEEDER shall be compensated as herein provided for all medications used for CATTLE which have died.
>
> i. The cost of the gain used in case of cattle which have died shall be the cost of the gain over time as determined at the time when all CATTLE on feed have been sold.
>
> ii. ~~For CATTLE dying within 60 days of arrival at the feedyard the presumed rate of gain used shall be two (2) lbs. per day.~~
>
> iii. Unless actual weights are determined, CATTLE dying after having been in the yard at least 61 days, the weight shall be determined by using the rate of gain [*sic*] average rate of gain achieved by the entire group of CATTLE that were marketed times the actual days the CATTLE WERE on feed.

Dft. Trial Ex. A5 (strikeout in original). The predicate conditions for the application of this provision, such as that Bischer Farms would inform Scarff Brothers in a timely fashion of cattle deaths and preserve lot designations, did not obtain.

March 2003 through February 2004.  Their dealings after March 2003, as shown by Scarff Brothers'

business records, demonstrate that they continued to operate under the same mutual understanding.

For instance, Duane Geiger would periodically adjust the maximum cost of gain per pound, with the

assent of Scarff Brothers.  When Scarff Brothers' cattle arrived at Bischer Farms, Duane Geiger

verified their arrival and the number of head received and confirmed those figures with Howard

Scarff.  Bischer Farms would then bill Scarff Brothers on a monthly basis, attributing various

charges to each lot.  Lance Scarff would review those charges and then issue payment.  Once the

cattle were finished or marketable, Howard Scarff and Duane Geiger would confer about which

cattle to send to market.  Based on those conversations, Duane Geiger would select the cattle for sale

and have them trucked to the stockyard.  Lance Scarff would receive the kill sheets, and Bischer

Farms would issue Scarff Brothers a closeout invoice when all the cattle in a particular lot were

finished.  Finally, Lance Scarff would issue payment on each closeout invoice, after he verified its

accuracy.  This course of dealing, repeated continuously and systemically over 40 lots, establishes

a course of dealing between Scarff Brothers and Bischer Farms, which shows the existence of a

contract implied in fact.

     In light of this course of dealing, Bischer Farms assumed the responsibility for cattle in its

care.  Indeed, a component of the charges included in the invoices to Scarff Brothers was insurance

secured by the Bischers for Scarff Brothers' cattle.  The precise terms and conditions of this

insurance was not shown at trial, apart from demonstrating that a Bischer entity, and not Scarff

Brothers, was the insured party.  This fact underscores that, while at Bischer Farms, the Bischers had

assumed responsibility to feed, maintain, and finish to market Scarff Brothers' cattle.  Numerous

cattle were delivered to Bischer Farms but subsequently disappeared while in the Bischers' care.

Consequently, the unaccounted for disappearance of cattle constitutes a breach of contract. Bischer Farms did not provide Scarff Brothers the service for which it had contracted – the feeding and finishing of cattle to a point ready for profitable slaughter.

Nor does the Court accept the Bischers' ever-evolving theory that the missing cattle were necessarily all in the composter decomposing. More importantly, even if the Court could stomach that theory as true, Bischer Farms would still be in breach of contract. Invoices still issued to Scarff Brothers for cattle but did not identify a notable death loss at that time. As counsel for both sides agreed early in the proceedings, dead cattle do not require feed. While the Bischers subsequently attempted to develop a theory of damages that allow some costs attributable to dead cattle, the Bischers' failure to alert Scarff Brothers to the supposed death of nearly 200 head of cattle in lots 1 through 40 alone would remain a breach of contract, had the Court been persuaded by the Bischers' version(s) of the events.

## C. Scarff Brothers' Non-Contract Claims

Apart from its breach of contract claim, Scarff Brothers also seeks to recover for the same injury on a variety of other legal theories, including negligence, innocent or fraudulent misrepresentation, silent fraud, breach of fiduciary duty, breach of bailment, and common law and statutory conversion. First, it is hornbook law that a claimant cannot receive a double recovery for the same injury, even where alternate legal theories will support the same finding of liability. More importantly, pursuant to the economic loss doctrine, Michigan does not permit recovery for a claim that sounds in contract under a tort theory. *See Neibarger v. Universal Cooperatives, Inc.*, 486 N.W.2d 612 (Mich. 1992). If a purchaser suffers only economic losses at the hands of a seller, then the purchaser's only available remedy is in contract. *Id.* at 520 (internal quotation and footnote

omitted).  Michigan has subsequently extended the economic loss doctrine to contracts for services.

*See Rinaldo's Construction Corp. v. Michigan Bell Telephone Co.*, 559 N.W.2d 647, 657-658 (Mich. 1997) (refusing to permit a construction company's claim in tort to proceed against a telephone company, where their relationship was contractually based).

Here, Scarff Brothers suffered injury in the course of its business dealings with the Bischers. The parties operated pursuant to a contract established by their course of dealing.  Although not clearly identified via a written contract, the harm substantiated by Scarff Brothers was only economic, i.e., the disappearance of its inventory and associated economic expenses.  Accordingly, as stated on the record regarding Scarff Brothers' motion for judgment on partial pleadings under Federal Rule of Civil Procedure 52, Scarff Brothers' various tort-based claims are foreclosed by Michigan's economic loss doctrine.

In addition to being barred by Michigan's economic loss doctrine, Scarff Brothers did not establish statutory conversion by a preponderance of the evidence.  Mich. Comp. Laws § 600.2919a(1) permits treble damages, as well as costs and reasonable attorney fees, to "[a] person damaged as a result of . . . [a]nother person's stealing or embezzling property or converting property *to the other person's own use*."  (Emphasis added.)  Here, Scarff Brothers did show that a significant number of head of cattle went missing and that the entity caring for those cattle could provide no satisfactory explanation for that disappearance.  The Bischers' difficulty in producing relevant documents and the ever-evolving theory of their defense strained credulity and suggested some measure of involvement by some or all of the defendants in the disappearance of Scarff Brothers' cattle.

Yet that strongly supported inference does not substantiate that any allegedly converted cattle

went "to the other person's own use." Scarff Brothers provided no evidence on that element of statutory conversion. Absent any evidence on the point, the Court cannot conclude that, for instance, Melvin Bischer or Duane Geiger converted Scarff Brothers' cattle *to his own use*. (Nor can the Court reach that conclusion as to any of the other defendants.) While it seems improbable that no one among the Bischers received some benefit of the missing cattle, it is equally, if not more, improbable that the volume of cattle missing disappeared without a trace. Despite years of opportunity to identify such support, Scarff Brothers offered no evidence that its cattle were sold to another cattle owner or sent to market. Because a plaintiff bears the burden of substantiating its own case and because Scarff Brothers provided nothing to suggest that the missing cattle were put to the Bischers' own use, the Court cannot conclude that the Bischers converted Scarff Brothers' cattle, pursuant to Mich. Comp. Laws § 600.2919a, even were that claim not barred by the economic loss doctrine.

### C. Counterclaim of Bischer Farms, Inc.

In its counterclaim, Bischer Farms, Inc. alleges a breach of contract against Scarff Brothers. According to the counterclaim, Bischer Farms, Inc. asserts its entitlement to the profits it would have earned on lots 40 through 60, if Scarff Brothers had permitted Bischer Farms to finish its cattle. That is, when Scarff Brothers removed its cattle from Bischer Farms in February and March 2004, Scarff Brothers allegedly prevented Bischer Farms from fulfilling its contract and, thus, having the opportunity to charge Scarff Brothers for costs incurred in that endeavor.

The Bischers' contention that Scarff Brothers should have left their remaining cattle to finish at Bischer Farms – after the Bischers reported to the Scarffs that nearly 500 head of had been stolen – is absurd. Moreover, notwithstanding the variety and extent of the Bischers' proofs, they did not

substantiate that any costs they incurred in feeding and caring for cattle removed early from Bischer Farms exceeded their recoverable expenses, in accordance with the contract implied in fact. The only proofs offered regarding the value of the counterclaim came through Dr. Hentschl and his report, which was not admitted. For reasons explained in greater detail below, his report was of questionable value. Regarding the amounts that he described in a "Summary of Totals Due Bischer Farms, Inc.," Dft. Ex. J59, Dr. Hentschl's testimony revealed that these amounts either did not conform to the parties' course of dealing or otherwise resulted from inconsistent and questionable sources of data provided to Dr. Hentschl. Dr. Hentschl testified that he did not use Bischer Farms' records to arrive at his figures for total veterinary treatment and processing. Instead, he relied on data from his own veterinary practice and attempted to proportionally allocate expenses between questionable inventory figures assigned to Bischer Farms' cattle, on the one hand, and to feedlot clients' cattle, on the other hand. He also stated that the costs of gain and yardage came from fixed amounts, rather than from figures adjusted for each lot, as was the parties' consistent agreement. As to the costs for insurance, Dr. Hentschl could not support the amounts he identified. Consequently, if Bischer Farms suffered a harm by not finishing certain cattle, it did not offer sufficient proofs to establish that harm. The recurrent deficiencies in the Bischers' records which prevented them from establishing a course of dealing other than that shown by Scarff Brothers' records similarly prevents the Bischers from demonstrating any lost profits. Accordingly, the evidence did not establish damages on the counterclaim, in addition to the fact that the Court was unpersuaded that Scarff Brothers' election to remove its cattle from Bischer Farms constituted a breach of contract.

## IV. Damages

### A. Lance Scarff's Testimony Regarding Damages for Scarff Brothers

Scarff Brothers did not present any expert testimony regarding damages. Instead, they offered the testimony of Lance Scarff, who served in an accounting capacity for Scarff Brothers. According to Lance Scarff, Scarff Brothers suffered damages in the following categories: (1) the value of the missing 491 head of cattle; (2) the lost profit on the 491 head of cattle; (3) the expense of lost hedging price on the missing 491 head of cattle; (4) the increased cost from a higher cost of gain per pound to feed cattle removed from Bischer Farms; and (5) transportation, storage, and labor costs incurred in removing cattle from Bischer Farms.

After establishing that 491 head of cattle were missing, Lance Scarff attempted to identify from which lot cattle were missing. He relied on an inventory of the Scarff Brothers' cattle that were physically present at Bischer Farms after February 11, 2004, Scarff Brothers' records, and any records available from Bischer Farms regarding which cattle had come in a given lot. He was able to identify the number of cattle missing from lots 41, 50, 54, 55, 56, 58, 59, and 60. He was not able to identify missing cattle specifically by lot for the other lots that were not closed out. He was, however, able to differentiate the lots that contained steers (lots 42, 45, 46, 47, 49, 51, 52, and 57) from the lots that contained heifers (lots 43, 44, 48, and 53). He calculated that the value of the cattle missing in the identifiable lots was as follows: (1) lot 41 - $11,214.72 for 33 head of cattle; (2) lot 54 - $1,281.96 for 4 head of cattle; (3) lot 55 - $1,562.52 for 3 head of cattle; (4) lot 56 - $2,229.08 for 7 head of cattle; (5) lot 58 - $1,305.88 for 4 head of cattle; and (6) lot 59 - $953.28 for 3 head of cattle. Lots 50 and 60 had no head of cattle. After calculating the average cost per head of cattle for the undifferentiated lots of steers as $732.98 per head, he concluded that the value

of those 371 head of cattle was $271,935.58. After calculating the average cost per head of cattle for the undifferentiated lots of heifers as $684.08 per head, he concluded that the value of those 66 head of cattle was $45,149.28. The sum of the value of the six identified lots, the undifferentiated steers lots, and the undifferentiated heifers lots is $335,632.30.

Lance Scarff also testified that Scarff Brothers lost profits on the 491 head of cattle that it could not take to market. He calculated the average profit per head of cattle in lots 31 through 40, which consisted of similar cattle that were marketed in a similar time period to that in which the missing cattle would have been marketed. That average profit per head, conservatively, was $404.83. Applying that figure to the 491 head of missing cattle, Scarff Brothers' lost profits on lots 41 through 60 were $198,771.53.

Regarding hedging costs, Lance Scarff testified that Scarff Brothers suffered damages for hedging cattle that did not exist. Its hedging costs on 371 steers and 66 heifers were $2,834.44 and $578.82, respectively. Thus, Scarff Brothers' losses on hedging costs was $3,413.26.

Next, Lance Scarff testified regarding the additional cost of gain per pound. Based on the course of dealings between the parties, Scarff Brothers and Bischer Farms had agreed to set a cost of gain per pound for each lot. Indeed, that cost was recorded for every lot. As previously noted, with very few exceptions, the cost of gain per pound includes all the costs, such as feed, required for an animal to gain a pound. Smaller cattle require less feed to gain a pound than do larger cattle, so the cost of gain per pound increases over time. Consequently, in the course of negotiating a cost of gain per pound applied for the length of cattle's stay at a feedlot, the size of cattle and duration of their stay at a feedlot would inform on the cost of gain per pound agreed to by a cattle broker and a cattle feedlot. When Scarff Brothers removed its cattle from Bischer Farms, it needed to finish out

its cattle at another feedlot. Scarff Brothers lost any advantage that it previously had from negotiating a lower cost of gain per pound for cattle that had arrived when smaller at Bischer Farms but would later arrive much larger at other feedlots. Additionally, the cost of feed had increased during that time as well. Consequently, on average, the cost of gain per pound to finish out the removed cattle at other feedlots increased by $0.11. Applying that amount to the 519,458 pounds gained by the removed cattle that were finished at other feedlots, Scarff Brothers suffered damages of $57,140.38.

Finally, Lance Scarff testified that Scarff Brothers incurred additional costs to remove their remaining cattle from Bischer Farms. Scarff Brothers' personnel had to come to Bischer Farms to perform the removal on March 15 and 16, 2004. The removed cattle had to be transported to other feedlots and stored temporarily at another location. He stated that the labor cost was $5,000, the trucking cost for 1,647 head of cattle was $14,194.80, and the temporary storage charge was $1,378. Regarding Scarff Brothers' "estimated" labor costs, the Court was not satisfied that testimony supported that estimated value, no matter how reasonable. Consequently, Scarff Brothers also suffered damages of $15,572.80.

In its complaint, Scarff Brothers did seek exemplary damages from Bischer Farms Partnership, Melvin Bischer, Janet Bischer, Pauline Geiger, Bradley Geiger, and Duane Geiger. In the volume of proofs, however, Scarff Brothers did not articulate the specific additional damages it seeks, in addition to the damages for its injury. Further, to receive exemplary damages, a plaintiff must show that conduct by a defendant was malicious or so willful and wanton as to demonstrate reckless disregard of the plaintiff's rights. *Bailey v. Graves*, 309 N.W.2d 166, 169 (Mich. 1981). While the Bischers' conduct during discovery might be characterized as willfully deficient, Scarff

Brothers' proofs demonstrated only a breach of contract but did not extend to show reckless disregard for its rights.

Thus, to review, Lance Scarff's testimony and his supporting exhibits show that Scarff Brothers suffered damages of $335,632.30 for its missing 491 head of cattle, $198,771.53 in lost profit on those cattle, $3,413.26 in lost hedging costs on those cattle, $57,140.38 in increased costs due to a higher cost of gain per pound to finish out the cattle removed from Bischer Farms, and $15,572.80 for transportation, storage, and labor costs to remove cattle from Bischer Farms. In total, Scarff Brothers' damages are $610,530.27.

### B. Dr. Arnold Hentschl's Testimony for the Bischers Regarding Damages

Dr. Arnold Hentschl, a veterinarian, testified on behalf of the Bischers. Dr. Hentschl graduated from Michigan State University School of Veterinary Medicine in 1955. He currently is president of Harbor Beach Veterinary Services, P.C., which provides veterinary services for all the cattle at Bischer Farms. He has no formal training in economics or accounting.

Scarff Brothers objected to his testimony, based on its understanding that the predecessor judge had previously instructed the parties that no experts could be offered. According to the case management and scheduling order of June 29, 2004, the deadline for Scarff Brothers to disclose any expert witnesses, along with expert reports was September 1, 2004. The corresponding date for the Bischers to disclose any expert witnesses was October 1, 2004. Scarff Brothers objected that Dr. Hentschl was not identified prior to October 1, 2004 as an expert and, so, could not be offered as such at trial. The Bischers did not dispute that they identified no expert by that date, although they did contend that Dr. Hentschl should still be accepted as an expert witness.

Based on Federal Rule of Civil Procedure 26(a)(2)(C), Dr. Hentschl was not timely disclosed

as an expert witness. Further, had he been timely disclosed as an expert, much of his testimony could not have been received under Federal Rule of Evidence 702. Although he has extensive expertise as a veterinarian, he did not establish his expertise in the fields of economics or accounting. Notwithstanding his many distinguished professional accomplishments, his brief explanation that he provides consulting services to feedlots does not demonstrate that he can aid the trier of fact based on a particularized knowledge of economics, even if the subject of the economic issues applies to animals. For these reasons, the Court did not permit Dr. Hentschl to testify as an expert witness offering an accounting of damages or of cattle missing.

The Court did, however, permit the Bischers to make an offer of proof. Defense counsel asked Dr. Hentschl to provide his opinion about Scarff Brothers' economic losses. Dr. Hentschl acknowledged that he was not present during Lance Scarff's testimony. Nor had he been furnished with a transcript of Lance Scarff's testimony.

Without direct exposure to Lance Scarff's rationale or conclusions, Dr. Hentschl offered essentially three criticisms of Lance Scarff's testimony, which Dr. Hentschl summarized in Defendants' Exhibit J58, entitled "Recast of Plaintiff's Alleged Damages." First, Dr. Hentschl calculated the value of Scarff Brothers' missing cattle as $291,855.50, in contrast to Lance Scarff's calculation of $335,632.30. Dr. Hentschl based his figure on a weighted average of his understanding of the cost of cattle for lots 41 through 60. He did acknowledge, however, that if Scarff Brothers' records reflected the actual costs for the cattle, as the Court is persuaded they do, that Lance Scarff's figures would be more precise than his. Second, Dr. Hentschl's calculation of Scarff Brothers' lost profits on the missing cattle – 491 head at $66.68 – differed dramatically from Lance Scarff's calculation of those lost profits – 491 head at $404.83. That is, Dr. Hentschl assessed

the lost profits at $32,739.88, but Lance Scarff assessed them at $198,771.53. Dr. Hentschl's calculations, however, rested on eight groups of cattle (totaling 1,765 head and summarized at Defendants' Exhibit J55), all of which were sold after February 13, 2004 and well after the missing cattle could no longer be accounted for. Additionally, he based his figures on what he believed a reasonable aggregate amount would be for the cost of gain per pound. Yet this approach does not correspond to the ongoing practice of Howard Scarff and Duane Geiger (1) to agree to a cap or ceiling on the maximum cost of gain per pound for each lot but (2) to bill for less if the actual expenses warranted. Finally, Dr. Hentschl's analysis overlooked any attention to the additional expense for Scarff Brothers to finish out the cattle that they removed from Bischer Farms in lots 41 through 60. Although Lance Scarff approximated that cost at $57,140.38, based on $0.11 for 19,458 pounds, Dr. Hentschl believed that the reimbursement rate for feed should reasonably have been raised, if the cattle had remained at Bischer Farms. In Dr. Hentschl's view, the increasing market price for cattle feed would have justified such an increase. This view completely disregards the course of practice established by the discussions between Howard Scarff and Duane Geiger to set a maximum cost of gain for each lot.

In addition to his criticisms of Lance Scarff's testimony, Dr. Hentschl also proposed an extensive report that purported to estimate Bischer Farms, Inc.'s lost revenue due to Scarff Brothers' premature removal of their cattle, which occurred after Melvin Bischer informed Lance and Howard Scarff that hundreds of head of Scarff Brothers' cattle had been stolen. That is, he suggested that the departure of the cattle in lots 41 through 60, before they could be finished, prevented Bischer Farms, Inc. from recouping its costs and generating a profit for feeding the cattle. He summarized these alleged expenses in Defendants' Exhibit J3, as amended at Defendants' Exhibit J59, as further

amended at Defendants' Exhibit J59A. He acknowledged that he did not use Bischer Farms, Inc.'s records to determine the total treatment expense or the total processing expense for what he believed to be the relevant head of cattle, which he listed as $65,396 and $128,532, respectively. Instead, he used business records from Harbor Beach Veterinary Services, P.C. from August 2002 to January 2004. He also sought to allocate a percentage cost relationship between Scarff Brothers' cattle and Bischer Farms' cattle, based on a comparison between when their respective cattle "started," i.e., commenced feeding at Bischer Farms. *See* Defendants' Exhibit J9, Columns B & C. Dr. Hentschl could not recall, however, who provided him with the date for the cattle "start" and, thus, could not vouch for the accuracy of the information.

Within his estimate of Bischer Farms, Inc.'s alleged losses to Scarff Brothers, Dr. Hentschl also sought to justify a reduction in the amount that Scarff Brothers had paid to Bischer Farms, Inc. in its progress billings. He asserted that Scarff Brothers "prepaid" $86,677 in response to progress billings. He testified that he received this information from Michelle Powell, the secretary at Bischer Farms. She testified, however, that she could not recall the source of her information and that she had no worksheets. More important, she testified that the "prepaid" offset might actually reflect an aggregate reimbursement for lots 1 through 40. Dr. Hentschl, on the other hand, sought to utilize the figure for lots 41 through 60.

Finally, as to this additional report, Dr. Hentschl again employed figures based on his assessment of what constituted a "reasonable" cost of gain per pound, such as 838,500 pounds at $0.443 per pound, for a total of $370,059.19, or a yardage cost of 2,398 yard at $0.30 per yard. At no point did Dr. Hentschl discuss with Duane Geiger, or any other representative at Bischer Farms, the agreement for the Bischers to negotiate with Scarff Brothers for an agreed upon cost of gain per

pound, set for each lot of cattle. Further, Dr. Hentschl could not support the source of the insurance charges and the offset prepaid amounts. Finally, the evidence did not substantiate Dr. Hentschl's inclusion of additional charges for eight head of dead cattle that allegedly died between February 16, 2004 and March 12, 2004, as suggested in Defendants' Exhibit J18. Nothing in his testimony required concluding that those cattle had not already been included in earlier billings, given that those cattle arrived as early as August 25, 2003. For the foregoing reasons, the Court is not persuaded to rely on Dr. Hentschl's testimony regarding the number of head of cattle missing and the damages of the parties.

## V. Liability and the Several Defendants

### A. Bischer Farms Partnership as Successor to Bischer Farms, Inc.

Generally, a successor business does not assume the debts and liabilities of the selling corporation, although some exceptions do exist. *Antiphon, Inc. v. LEP Transport, Inc.*, 454 N.W.2d 222, 224 (Mich. 1990). Two such exceptions are "when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation . . . [or] when the new corporation is a mere continuance of the old . . . ." *Id*. at 224-225. Thus, based on the facts of each case, such factors as "the effect of the transfer on the creditors of the predecessor corporation . . . and admissions of liability on the part of officers or other spokespersons of the successor corporation" may show that a successor business entity assumed liability from the selling corporation based on an implied agreement to do so.

In *Antiphon*, the court found that the customer could reasonably believe that the successor company had assumed the liabilities of the predecessor company. *Id*. at 226. The successor company never informed the customer of the change. *Id*. Invoices were sent to the predecessor

corporation and paid by checks issued by either the successor corporation or a conjunction of the names of the two corporations. *Id.* Further, the court noted that the customer dealt with the same personnel, placed orders in the same manner, and conducted business operations in the same manner.

Similar to the business entities in *Antiphon*, the dealings between Bischer Farms, Inc. and Bischer Farms Partnership were sufficient to permit Scarff Brothers to reasonably believe that Bischer Farms Partnership was a successor entity to Bischer Farms, Inc. Janet Bischer testified that Bischer Farms Partnership continued to conduct the same business as had Bischer Farms, Inc. The reorganization was done solely to qualify for additional agricultural benefits from the government. The partnership used the same employees, at the same address, and the same phone numbers, and the same individuals had decision-making authority. Janet Bischer acknowledged that the partnership assumed the leases in the corporation's name. Based on her experience handling banking for both the corporation and the partnership, she stated that the partnership, at times, assumed obligations for the corporation. She also described how employees of the partnership, formerly employees of the corporation, continued to care for the same cattle. She also allowed that the partnership may have received money for some of the corporation's cattle, as well as that checks payable to the corporation may have been deposited in the bank account of the partnership. Further, the partnership "allocated" both income and expenses related to the care of Scarff Brothers' cattle to the corporation in their internal business records.

Next, Scarff Brothers' direct dealings with Bischer Farms Partnership supported its belief that it was the same entity as Bischer Farms, Inc. First, Bischer Farms Partnership never informed Scarff Brothers of the change in ownership. After the transition from corporation to partnership, Scarff Brothers continued to deal with the same personnel in the same manner.

Accordingly, the Court concludes that Bischer Farms Partnership is a successor to Bischer Farms, Inc. and, so, assumed the debts and liabilities of the corporation. Based on the definition of partnership, that liability accrues to the partners of Bischer Farms Partnership, which includes the following named defendants: Melvin J. Bischer, L.L.C.; Janet S. Bischer, L.L.C.; and Pauline J. Bischer-Geiger, L.L.C. *See* Mich. Comp. Laws § 449.15.

## B. Alter Ego Liability

Generally, alter ego liability means that an individual who abuses the corporate form to conduct personal business may face liability because a court can then pierce the corporate veil. "Where a corporation is so organized and so controlled as to make it a mere instrumentality or an agent of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit." *Shirley v. Drackett Products Co.*, 182 N.W.2d 726, 728 (Mich. Ct. App. 1970). Factors to consider in determining whether this abuse occurred include the following: (1) the absence of corporate formalities; (2) commingling personal and corporate funds; (3) siphoning corporate funds to a dominant stockholder; and (4) operation of the corporation as a mere facade for the personal operations of a stockholder. *United States v. Walton*, 909 F.2d 915, 928 (6th Cir. 1990) (citations omitted).

Here, the extensive and ongoing interrelationship between the various defendants demonstrates that they operated as alter egos of Bischer Farms, Inc. As the parties' stipulation of facts of April 27, 2007 states at ¶ 55: "The following entities have [a] unity of interests and ownership with Bischer Farms: Bischer Farms Partnership, Bischer Tiling, Bischer Ready-Mix, Janet S. Bischer Farms, Janet S. Bischer LLC, Melvin J. Bischer LLC, and Pauline J. Bischer-Geiger LLC."

The other corporate and limited liability company defendants (Janet S. Bischer Farms, Inc.; Bischer Tiling, Inc.; Bischer Ready-Mix, Inc.; Melvin J. Bischer, L.L.C.; Janet S. Bischer, L.L.C.; and Pauline J. Bischer-Geiger, L.L.C.) are owned and operated by Melvin Bischer, Janet Bischer, Bradley Geiger, and Pauline Geiger as a single business enterprise. This economic reality is substantiated by extensive intercompany transactions. The Notes to the Combined Financial Statements of Bischer Farms Partnership and Affiliates of December 31, 2005 and 2004,[9] for example, report a trade receivable of $636,360 owed to Bischer Farms, Inc. by Melvin and Janet Bischer. The same Notes also report a trade receivable of $495,084 owed to Bischer Farms, Inc. by Bradley and Pauline Geiger. These intercompany receivables did not result from an arms-length transaction. Janet Bischer testified that each entity was respected for accounting purposes but that that separate treatment blurred for business purposes. Any entity with available cash would "loan" another entity the funds to meet a necessary payment. The criteria for the intercompany receivables and payables were justified solely to maintain the viability of the enterprise as a whole. Indeed, the function of the accountants' effort to combine the financial statements was to reflect the integrated nature of their operations, as well as to "wash out" the intercompany transactions for the secured creditors who had received pledges of collateral from the business entities.[10]

---

[9]Dft. Trial Ex. Q90.

[10]Note 8 regarding Related Party Transactions of the Combined Financial Statement of Bischer Farms, Inc. and Affiliates of November 30, 2003 and 2002, lists the intercompany receivables and payables among Bischer Farms, Inc., Bischer Tiling, Inc., Bischer Ready Mix, Inc., Brad and Pauline Geiger, Melvin and Janet Bischer, and Janet S. Bischer Farms:

|  | November 30, | |
| --- | --- | --- |
| Intercompany receivables and payables consist of the following: | 2003 | 2002 |

**Bischer Farms, Inc. intercompany receivable:**

To summarize, these defendants operated as a single comprehensive business enterprise.

---

| | | |
|---|---:|---:|
| Bischer Tiling, Inc. | | 284,910 |
| Melvin and Janet Bischer | 733,783 | 681,390 |
| Janet S. Bischer Farms, Inc. | 71,475 | 112,520 |
| Brad and Pauline Geiger | 499,800 | 173,221 |
| **Total Bischer Farms, Inc. intercompany receivable** | 1,305,058 | 1,252,041 |
| | | |
| **Bischer Tiling, Inc. intercompany receivable:** | | |
| Bischer Farms, Inc. | 217,743 | 405,161 |
| Melvin and Janet Bischer | 27,600 | |
| **Total Bischer Tiling, Inc. intercompany receivable** | 245,343 | 405,161 |
| | | |
| **Bischer Ready Mix, Inc. intercompany receivable:** | | |
| Melvin and Janet Bischer | 220,141 | 128,050 |
| Brad and Pauline Geiger | 22,000 | 20,000 |
| Janet S. Bischer Farms, Inc. | 35,900 | 21,100 |
| Bischer Tiling, Inc. | 15,291 | 16,300 |
| Bischer Farms, Inc. | 288,572 | 351,371 |
| **Total Bischer Ready Mix, Inc. intercompany receivable** | 581,904 | 536,821 |
| | | |
| **Brad and Pauline Geiger intercompany receivable:** | | |
| Bischer Tiling, Inc. | 164,208 | 172,208 |
| | | |
| **Melvin and Janet Bischer intercompany receivable:** | | |
| Brad and Pauline Geiger | | 38,407 |
| Janet S. Bischer Farms, Inc. | 272,646 | 276,646 |
| **Total Melvin and Janet Bischer intercompany receivable** | 272,646 | 315,053 |
| | | |
| **Janet S. Bischer Farms intercompany receivable:** | | |
| Brad and Pauline Geiger | 16,000 | |
| | | |
| **Total intercompany receivable and payable** | 2,585,159 | 2,681,284 |

The intercompany receivables and payables are nonsecured, due on demand and bear interest at 6%.

Dft. Ex. Q23.

They transferred and commingled equipment, labor, and cash on a routine and extensive basis so as to ensure the continuity of the whole. The transactions toward that end were not negotiated at arms length and, at times, went undocumented. Janet Bischer acknowledged that business funds would sometimes pay for her and her husband's personal bills. She had no explanation for several sizeable non-payroll checks that were drawn from business accounts and paid to Melvin Bischer, Bradley Geiger, or Pauline Geiger.

Melvin Bischer testified, when discussing the document proffered as a contract with Scarff Brothers, that the parties to that purported agreement were "the four of us." In his mind, he did not differentiate the entity providing services to Scarff Brothers as separate from himself, his wife, his daughter, and his son-in-law. Nor could he identify his position as corporate officer in any of the various corporate entities when posed that question on the stand.

Thus, Scarff Brothers has shown that Melvin Bischer, Janet Bischer, Pauline Geiger, Bradley Geiger, Janet S. Bischer Farms, Inc., Bischer Tiling, Inc., Bischer Ready-Mix, Inc., and the limited liability company defendants were alter egos for Bischer Farms, Inc. To say that any single entity, whether drained of resources to sustain another family entity or enriched at the expense of another entity, is solely responsible to Scarff Brothers would not accord with the Bischers' economic practice. The economic reality of the many Bischer entities was that of a single enterprise, such that the liability of one entity is the liability of all, because the separation between those entities exists in name only.

## VI. Conclusion

For the reasons set forth above, the Court finds that Scarff Brothers is entitled to judgment on its claim of breach of contract but that the defendants are entitled to judgment as to Scarff

Brothers' other claims. The Court further finds that Bischer Farms, Inc. is not entitled to judgment on its counterclaim.

Accordingly, Scarff Brothers is entitled to recover damages in the amount of $610,530.27. The Court also finds that Bischer Farms Partnership, as a successor business, bears liability for Bischer Farms, Inc.'s liability and that, due to alter ego liability, the following defendants bear liability for Bischer Farms, Inc.'s liability: Melvin Bischer, Janet Bischer, Pauline Geiger, Bradley Geiger, Janet S. Bischer Farms, Inc., Bischer Tiling, Inc., Bischer Ready-Mix, Inc., Melvin J. Bischer, L.L.C., Janet S. Bischer, L.L.C., and Pauline J. Bischer-Geiger, L.L.C.

A judgment consistent with the foregoing findings of fact and conclusions of law will enter separately. The Court does not retain jurisdiction.

**IT IS SO ORDERED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 5, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 5, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS